THE STATE OF NEBRASKA, EX REL. JASON G. MILLER, v. ROBERT B. GRAHAM, COUNTY TREASURER.

1. **School Lands**: DEFAULT IN PAYMENT OF INTEREST. On the facts proved, *Held*, That a preponderance of the testimony showed that the relator had been duly notified of the default in the payment of the interest on his school lands before the same were declared forfeited to the state and resold.

2. ——: ——: NOTICE: FORFEITURE: RE-SALE. The statute, while it requires notice to be given to the purchaser of school lands of his default in paying the interest thereon before said lands are declared forfeited, yet it is the duty of such purchaser to pay the interest due thereon annually, and when he has failed for many years to perform his duty in that regard and the lands in the meantime have been declared forfeited and resold, it will be presumed that proper notice was given before forfeiture was declared, upon the principle that official acts of public officers, which presuppose the existence of other acts to make them legally operative, are presumptive proof of the latter.

3. **Estoppel**: ACTS IN PAIS. If a party knowingly, though it be done passively by looking on, suffers another to purchase and expend money on land under an erroneous opinion of title without making known his own claim, he will not afterwards be permitted to exercise his legal rights against such person.

ORIGINAL application for mandamus.

*Marquett, Deweese & Hall*, for relator.

*Harwood, Ames & Kelly*, for respondent.

MAXWELL, CH. J.

This is an application for a writ of mandamus to issue out of this court, commanding Robert B. Graham, county treasurer of Lancaster county, Nebraska, or his successor in office, to receive from the relator the several sums of money that may be due from the relator to the respondent

on four certain contracts of purchase entered into by the relator with the state of Nebraska, and commanding the said county treasurer to give a receipt therefor showing that final payment of the balance of the principal and interest has been paid on the contracts of purchase. It is alleged in the plaintiff's petition that on the 15th day of June, 1868, the relator purchased from the state of Nebraska lot 14, being a part of the north-west quarter of section 36, town 10, range 6, for one hundred dollars per acre, and that he paid one-tenth cash payment as required by law, and gave his note as required by law of Nebraska for the residue of purchase money, to-wit, $450.

"The contract of purchase entered into by the state of Nebraska with your relator is as follows:

"Whereas, in pursuance and by virtue of an act of the legislative assembly in such case provided, and after due public notice, the state of Nebraska, on the day of the date hereof, has struck off at public sale to J. G. Miller, as purchaser thereof, the following described tract of land, situated in the north-west quarter of section 36, town 10, range 6 east, in Lancaster county, Nebraska, described as lot number 28, according to the survey and recorded plat of said section 36, containing five acres more or less, at and for the aggregate price of $420; and whereas the said J. G. Miller has this day paid to the treasurer of Lancaster county, for the state of Nebraska, the sum of $42, being the one-tenth part of said purchase money aforesaid, and to secure the payment of the other part of said purchase money has executed and delivered his certain promissory note, indorsed by P. Peck and M. M. Culver, by which he has promised to pay to the order of the state of Nebraska, on the first day of January, A.D. 1880, the sum of $378, with interest thereon at the rate of ten per cent per annum from date hereof, said interest to be promptly paid annually in advance on the first day of January in each year until said note shall be fully paid.

"Now, therefore, I, J. G. Miller, the said purchaser aforesaid, of Cass county and state of Nebraska, in consideration of the premises aforesaid, and of the extension of time of payment of the aforementioned purchase money, do hereby for myself, my heirs, executors and administrators, covenant, promise, and agree to and with the state of Nebraska that so long as said purchase money, or any part thereof, secured by the above-mentioned promissory note remains unpaid, I shall not, nor will not commit or permit to be committed, in or upon the above-mentioned and described premises, tracts, or parcels of lands, any waste or spoils whatever, in timber or otherwise; and I do hereby, for myself, my heirs, executors, and administrators, further covenant, promise, and agree to and with said state of Nebraska, that upon the non-payment in advance by me, my heirs, executors, and administrators, of the annual interest, or any part thereof aforesaid, at the time when the same shall become due and payable, or upon the non-payment of said principal sum of $378 in said note mentioned, on the first of January, A.D. 1880, according to the tenor and effect of said promissory note above mentioned, or upon the commission of any waste or spoil whatever, by me, my heirs, executors, or administrators, in or upon said premises so struck off to him as purchaser as aforesaid, then and in that case all the said tract or parcel of land above mentioned and described, and all improvements thereon, shall be surrendered and absolutely revert to the state of Nebraska.

" In witness whereof I have hereunto set my hand this eleventh day of June, A.D. 1868.

J. G. MILLER.

In presence of
S. B. LINDERMAN.

"That the relator paid the interest on the balance of the said purchase money, for which he gave his note for the years 1869, 1870, 1871, 1872, 1873, 1874, up to the first of January, 1875; that on the 16th day of June, 1876, the

said lot number 14 was again sold, and the county treasurer pretended to cancel the contract of purchase which had formerly been made by the state of Nebraska with this relator; that the relator had no notice of any kind of the attempted or pretended cancellation, and that your relator did not know until after the cancellation had taken place that his contract had been or was to be cancelled; that he was never notified by any one in any manner that his interest in the purchase money of the above-described tract of land was due and unpaid.

"It is further alleged that the county treasurer and county commissioner, without any authority of law, pretended to cancel said contract of purchase, and proceeded to and did re-sell the said land to other and different parties, which sale was made on the 16th of June, 1876, for the sum of $350; that the said lots were sold at public sale without having given notice by publication, as required by law, and said sale was null and void and made without any authority of law, and in contravention of the statutes.

"The relator further alleges in his petition that ever since the said pretended sale and cancellation of this contract the county treasurer failed and refused to accept from the relator the said payment due on the balance of purchase money which fell due annually. The relator has always been ready and willing to make said payment under his contract.

"It is further alleged that on the 5th day of May, 1885, relator tendered to Robert Graham, county treasurer of Lancaster county, Nebraska, the sum of $991.08, being the balance of purchase money due the state of Nebraska, together with interest, interest on interest then due from relator to the state of Nebraska, as the balance of the purchase money on said lot number 14; that said Robert Graham's acknowledgment of the said tender, and the refusal of the same, is in words and figures as follows, to-wit:

"'I hereby acknowledge the tender of the above sums of

money as the correct amounts, and being the balance due the state of Nebraska as the purchase money due on said several tracts of land purchased by J. G. Miller from the state of Nebraska, and refuse to receive the same and give Miller final receipt for the same. This refusal on my part is made under the instructions of the board of public lands and buildings of the state of Nebraska.

Signed, R. B. GRAHAM,
*County Treasurer.'*

"It is further alleged by the relator that he is ready and willing, and at all times has been ready and willing, to pay to the state of Nebraska the balance of money due on the contract, together with interest thereon, and has been ready and willing to perform all things necessary to carry out and fulfil the said contract made with the state of Nebraska, and now brings the said sums of moneys into court, to-wit, the sum of $991.08, and offers the same in payment of the balance of purchase money due on said note and contract from him to the state of Nebraska.

"It is further alleged that unless Robert Graham, the county treasurer, is commanded and required to receive the said money, to-wit, the sum of $991.08 from your relator, and give him a final receipt therefor, showing that this is the balance of the purchase money, your petitioner will be remediless in the premises, and that your petitioner is wholly remediless in the premises except by the interposition of this court by the writ of mandamus to compel the said county treasurer to receive said sum of money on said contract of purchase in payment of the balance of the purchase money due on said land contract.

"These are the allegations constituting relator's first cause of action. In regard to lot number fourteen the petition for mandamus contains four causes of action. The second cause of action is the same as the first heretofore set out, which involves the title to lot 28, being part of the north-west quarter of section 36, town 10, range 6.

This lot was purchased from the state of Nebraska at the same time, and on the same terms as lot fourteen, for $84 per acre.   The interest payment for the same years was made on this lot as on the former lot, and a tender of the balance of purchase money was made to Robert Graham at the same time the tender was made for lot fourteen, and was refused in the same terms by the county treasurer.

" The third cause of action is the same as the first and second, with the changes in the amount of purchase price, and change in the amount of money tendered as the balance of purchase money due on said lot.

" The fourth cause of action is the same, with these changes:

" Notice was served on the respondent at the time of the filing of the petition, which notice stated that on the 11th day of August, 1885, or as soon thereafter as the relator could be heard, he would apply to the supreme court for a peremptory writ of mandamus to issue against defendant herein, to require him to receive and accept from the relator $4,083.79, or whatever sum may be due the state of Nebraska on said contract of purchase referred to in this application for a writ of mandamus, and require you to give receipt therefor, showing that final payment has been made on said contract of purchase.

" The prayer is as follows:

" ' Wherefore your petitioner respectfully prays this honorable court that a writ of mandamus may issue commanding the said R. B. Graham, county treasurer of Lancaster county, Nebraska, to receive from your relator the said sum of $991.07, as the balance of the purchase money due the state of Nebraska on the contract of purchase entered into by your relator with the state of Nebraska, and to issue to your petitioner receipt therefor, showing that final payment of the balance of the purchase money and interest has been made on said contract of purchase on said lot No. 14, and commanding the said R. B. Graham to also receive

from your relator the further sum of $832.47, as the balance of the purchase money due the state of Nebraska on lot number 28, being a part of the north-west quarter of section 36, town 10, range 6, Lancaster county, Nebraska, and to issue a receipt therefor showing that your petitioner has paid the balance of the purchase money due the state of Nebraska on his said contract of purchase heretofore referred to, and command the said R. B. Graham, the county treasurer, to receive the further sum from your petitioner of $1,076.97, as the balance of the purchase money due the state of Nebraska from your petitioner on his contract of purchase for lot 30, being a part of the north-west quarter of section 36, town 10, range 6 east, Lancaster county, Nebraska, and to give a receipt for the same showing that final payment has been made of the purchase money due the state of Nebraska from your petitioner on said contract of purchase; and that the said R. B. Graham be commanded to receive from your relator the further sum of $1,181.17, as the balance of purchase money due the state of Nebraska from your petitioner on the contract of purchase for lot number 6, being a part of the north-west quarter of section 36, town 10, range 6 east, Lancaster county, Nebraska, and to issue to your petitioner a receipt therefor showing that the balance of the purchase money due the state of Nebraska on the said contract has been paid, and as in duty bound your petitioner will ever pray.'

"The respondent filed an answer to the said petition August 25th, 1885, in which he admits that the title to the property described in relator's petition was, on the 15th day of June, 1868, in the state of Nebraska, and a part of the common school lands of said state; admits that the said land was appraised and advertised for sale in the manner provided by law, and that relator bid off said land described in said petition at public sale at the price alleged in the petition; but respondent avers that the only pay-

ments ever made by said Miller on account of said sale or pretended sale were one-tenth of said principal sum and annual interest on the residue thereof for the years 1869, 1870, 1871, 1872, and 1874; that after the first day of January, 1876, and more than thirty days prior to the 9th day of May in said year, one C. C. White, then treasurer of said Lancaster county, duly served on the relator a written or printed, or partly written and partly printed, notice, stating, in substance, that said relator was delinquent for installment of interest then accrued on account of his said purchase of said lot, and that unless such delinquency should be removed within thirty days after the date of said notice, said lot would be forfeited to the state, and said purchase cease to be of force by reason thereof, and that said lot would then again be offered for sale and sold in the manner as provided by law.

"Respondent further avers that thereafter one W. A. Sharrar, then clerk of said county, pursuant to said notice and in accordance with the statute in such case made and provided, published in the Nebraska *State Journal*, a newspaper printed, published, and of general circulation in said county, a notice to the effect that said lot, together with other tracts of land therein particularly described, belonging to the common school lands in said county, had been theretofore sold, but had reverted and become forfeited to the state by reason of non-payment of interest installments thereon, and would be again offered for sale; that said notice was published first on the 9th day of May, 1876, and therein continuously until the day of the sale, which was on the 15th day of June, 1876; pursuant to said last-named notice, and in accordance with the statute in such case made and provided, a sale of said lands was duly had and held at the time and place in the manner provided by law, at which sale a large number of lots and tracts of land which had reverted and become forfeited to the state in all respects in like manner as the said lot 14, and descriptions

of which were inserted in said notice so published in said newspaper, were offered for sale and sold, and among others of said lots the said lot 14 was in manner and form as aforesaid, offered for sale and duly sold at said sale to one William Miles, for the price of three hundred and fifty dollars, he being the highest and best bidder therefor, and that thereupon the said county, on account of said sale, received such sum of money, and executed and delivered such notes and contracts on account thereof as were by law required. And respondent avers that said relator was present at said sale and had full and personal notice and knowledge of all and singular the matters in this answer alleged, and that the relator, so far from making any objection or protest on account of said sale, or asserting any rights to said lot, or to any lot mentioned in his application herein, or intimating that he had or claimed any interest therein, actively participated in said sale as bidder and purchaser thereat, and did in fact purchase several lots so described in said published notice as having reverted and become forfeited to the state. And respondent further avers that thereafter the said Miles duly sold and assigned his right as such purchaser to one Celia Wallingford and one Jerome Schamp, and that on the first day of January, 1880, said assignees being still the holders and owners of said right and of said contract of purchase, and the same not being delinquent or in any way invalid, paid to the treasurer of said county the full amount of principal and interest then unpaid on said contract, and received his receipt therefor in duplicate as provided by law, and afterwards obtained deed to the said property from the state of Nebraska."

The second cause of defense is an answer to plaintiff's second cause of action, and is substantially the same as the first cause of defense heretofore set out in respondent's answer, which said defense refers to lot 28.

It is not alleged in this defense that the holder of the

22

contract of purchase of said lot has ever received any deed from the state of Nebraska. Defendant's· answer to the relator's third cause of action is substantially the same as the second cause heretofore set out and refers to lot 38, and as to the title to this lot defendant's answer shows that the holder of the contract of purchase has not yet received a deed to the said lot from the state of Nebraska.

The fourth defense, which is in answer to the relator's fourth cause of action, is the same as the cause of defense preceding this, with the exception that it alleges that the holder of the contract of purchase received a deed from the state of Nebraska in 1879.

The parties entered into a stipulation of facts as follows :

"That on and prior to the 15th day of June, 1868, the state of Nebraska was the owner in fee of lot six in the north-east quarter of section number 36, in township 10 north, of range 6 east of the 6th P. M. in Lancaster county, in said state, also of lots 14, 28, and 30 in the north-west quarter of said section, and that each of said lots was a part of the lands set apart for the permanent support of the common schools of sa'd state, and was prairie land.

"That prior to said 15th day of June, 1868, said lands had been duly appraised and advertised for sale by the officers of said county, and on said day were duly advertised for sale in the manner provided by law ; and that at such sale the relator was the highest and best bidder for each of said lots, and that each of them was struck off to him thereat at the following prices, viz.: Lot 6 at $59.50 per acre, lot 30 at $101 per acre, lot 14 at $100 per acre, lot 28 at $84 per acre. That thereupon the relator paid to the treasurer of said county one-tenth of the sum for which each of said lots was so struck off to him, and that thereafter the relator paid to the treasurer of said county interest on the residue of the purchase price of said lots 6, 14, and 28, at the rate required by law, as the same accrued, on

the first days of January from the year 1869 to and in-
cluding the year 1874 to January, 1875, and on the said
lot 30 from the year 1869 to the first of January, 1875.
That the sums for which said lots were struck off to the
relator were not less than $7 per acre, nor less than the
appraised value thereof.

"That on the 5th day of May, 1885, the relator ten-
dered to the treasurer of said county, on account of said
lot 14, the sum of $991.08, and on said lot 28 the sum of
$832.47, and on said lot 30 the sum of $1,076.97, and on
said lot 6 the sum of $1,181.17, and that said treasurer
refused to receive each and every of said sums.

"That on the 9th day of May, 1876, one William A.
Sharrar, who was then clerk of said county, published in
the Nebraska *State Journal,* a newspaper then and there-
after printed and published daily and weekly and of gen-
eral circulation in said county, a notice, of which a true
copy is hereto annexed, marked 'Exhibit A,' and made
a part thereof; and that said notice was published in said
newspaper three weeks consecutively, and that the first
publication thereof therein was on said 9th day of May,
1876.

"That at the time and place specified in said notice, to-
wit, at the clerk's office in said county, on the 16th day of
June, 1876, each and all of said several lots and tracts of
of land were duly offered for sale, and at said sale and at
private sale thereafter, pursuant to said notice, sold by the
clerk and treasurer of said county, said county clerk acting
as crier at said sale, and the county treasurer attending re-
ceiving the money and issuing receipts therefor. That prior
to said sale, on June 16, 1876, the treasurer of said county
entered opposite the description of said lots on the school
land register of said county the word 'reverted' and after-
wards the words 'and resold.'

"That at said sale, on June 16, 1876, said lot 14 was
sold to one William Miles, he being the highest and best

bidder therefor, at the price of $350, and the lot 28 was sold to one J. H. McMurtry at the price of $200; and the said lot 30 was sold to one N. S. Harwood for the price of $200; and the said lot 6 was sold to one William Miles for the sum of $350. Said several sums being not less than $7 per acre for said lots, not less than the appraised value thereof.

"That at the date of said sale, on the 16th day of June, 1876, each of said purchasers paid to the treasurer of said county, in cash, one-tenth of the said purchase price of the lot by him respectively so purchased as aforesaid, and received the county treasurer's receipt therefor, and executed and delivered to said treasurer his promissory note, stipulating in manner and form as provided by law for the payment to the state of Nebraska the residue of said purchase price ten years after said date, with interest at the rate of ten per cent per annum, payable annually in advance, the first payment of interest being computed to the first day of January after the said date of said note, and being paid accordingly.

"That on the 9th day of May, 1885, said N. S. Harwood, being still the owner of said contract of purchase of said lot number 30, paid to the treasurer of said county, in cash, all the rest and residue of the said purchase price of said lot then remaining unpaid, together with interest thereon at ten per cent per annum until January 1st, 1886, and received said treasurer's receipt in duplicate.

"That on the 11th day of June, 1885, one George P. Tucker was the owner, by purchase and assignment, of the said contract of purchase by said J. H. McMurtry of said lot 28, and on said day paid to the treasurer of said county, in cash, all the rest and residue of the said purchase price of said lot then remaining unpaid, with interest thereon at ten per cent per annum until January 1st, 1886, and received said treasurer's receipt therefor in duplicate.

"That on the 11th day of September, 1879, one J. M.

Knox was the owner, by purchase and assignment, of the said contract of purchase by the said William Miles, of said lot number 6, and on said day paid to the treasurer of said county, in cash, all the rest and residue of the said purchase price of said lot then remaining unpaid, together with interest thereon at the rate of ten per cent per annum until January 1st, 1880, and received said treasurer's receipt therefor in duplicate. And that thereupon said Knox surrendered said receipt to the commissioner of public lands and buildings of said state, whereupon, by order of the board of public lands and buildings, the said commissioner and the governor and secretary of said state executed and delivered to said Knox, under their several hands officially, and the great seal of the said state, a deed or patent purporting to convey said lot to said Knox in fee simple absolute, which deed or patent was duly filed for record and recorded in the clerk's office of said county on the 13th day of September, 1879. And that thereafter the said Knox, in consideration of $1,000 to him paid, conveyed said lot by deed of general warranty to one Daniel S. Owen and one Solon Hazelton in joint tenancy, which deed has also been filed for record in said clerk's office.

"That on the 1st day of January, 1880, one Celia Walingford, and one Jerome Schamp were jointly the owners, by purchase and assignment, of the contract of purchase by the said William Miles of said lot number 14, and on said day paid to the treasurer of said county, in cash, all the rest and residue of the said price of said lot remaining unpaid, together with interest thereon at the rate of ten per cent per annum until said date, and received said treasurer's receipt therefor in duplicate. And that thereupon said Wallingford and Schamp surrendered said receipt to the commissioner of public land and buildings of said state, whereupon, by order of the board of public lands and buildings of said state, the said commissioner, and

governor, and secretary of said state executed and delivered to said Wallingford and Schamp, under their hands officially, and the great seal of the state, a deed or patent purporting to convey said lot to said Wallingford and Schamp jointly, in fee simple absolute.    That said deed or patent was thereupon duly filed for record in the clerk's office of said county, and duly recorded therein, and that since the date of the said instrument aforesaid, the said Wallingford and Schamp have occupied and now occupy said lot as their several homesteads for themselves respectively and their families, both of said persons being married.

"This stipulation is conclusive as to the facts herein agreed upon, but shall not be construed as precluding either party from proving, or offering to prove, any other fact or facts material to the controversy, or from introducing or offering any testimony tending to prove any additional fact.

"It is further stipulated that the school land record for Lancaster county, in the year of 1876, shows that the relator purchased on the 14th day of July, 1876, lot 2 in the south-west quarter of section 36, township 10, range 6, and that on the 20th day of July, 1876, he also purchased lot 20 in the north-west quarter of said section.

"That the contract of sale of the said last-named tract was, on the 16th day of October, 1878, assigned by said Miller to one F. W. Ware, and was thereafter assigned through mesne assignments to one Isaac Oppenheimer, and was treated as being in force, and payments were made thereon by the holders thereof, from time to time, until May 11th, 1885, when final payment was made by said Oppenheimer, and the deed executed and delivered to him by the governor, land commissioner, and secretary of state.

"The records in the office of said land commissioner show that, as to lots 14, 38, and 30 in the north-west quarter of section 36, township 10, range 6, and lot 6 in

the north-east quarter of said section, annual payments accruing under the contract of sale of June 16, 1876, have all been made up to and including full and final payment.

"The published notice, a copy of which is annexed to the stipulation heretofore made in this action, appears upon the book in which appears the record of the appraisement of school lands in Lancaster county for the years 1875 and 1877.

"That there is no record in the land commissioner's office, state of Nebraska, of any notice of the relator being in arrears for payments on the lots set forth in the relator's bill, neither is there any record showing any notice was ever given the relator that his contracts of purchase to said property would be forfeited and cancelled unless his delinquent payments were made."

The testimony of the relator was taken by interrogatories, as follows:

Int. 1st. "Where did you reside in the month of May and June, 1876?"

Answer to Int. 1st. "At the corner of P and 18th streets in the city of Lincoln, state of Nebraska."

Int. 2. "Were you a subscriber to the Daily Nebraska *State Journal*, then published at Lincoln, Nebraska?"

Answer to Int. 2. "I think not; am not positive."

Int. 3. "Did you know, or were you informed in any manner prior to the 16th day of June, 1876, that the lots in controversy in this suit were to be offered for sale by the clerk and treasurer of said county on said day?"

Ans. to Int. 3. "I did not know of any cancellation of my contracts for these lots prior to said date, or of any intended cancellation, or of any contemplated sale of said lots; had never received any notice of delinquency or of cancellation, or of any sale to take place; never had any notice served on me, either printed, written, or verbal, that I was delinquent or of any danger of an effort to cancel

my contracts, or that my contracts had been cancelled, or that there was to be a sale of these lots on the 16th day of June, 1876, or at any other time.   Never saw any notice in any newspaper or posted in any place on this subject, nor had I any information of any kind, or intimation that said sale was to take place on said day.   I was not present at the sale; was not in Lincoln at the time.   I feel the more certain and positive that I had no information of this proposed sale, as I was interested in the lots to be sold to the amount of several thousand dollars, perhaps more interested in the sale of lots in section 36, T. 10, R. 6, than any other man, having purchased near one hundred acres, I think, at the sale of June 15th, 1868, and still held a large proportion of these lots by contract from the state of Nebraska, upon which I paid ten per cent of the purchase at the time; also ten per cent interest in advance annually for six years, so that I was largely interested in said sale, and could not have forgotten if I had received any information of said sale.   Another reason I feel sure I had no information of said sale is, that I had been annually annoyed and out of humor on account of the course pursued by the county and state in levying, assessing and collecting taxes on these lots in open violation of the express conditions of the sale that these lots were to be free from taxation, which statement was made publicly on the day of sale by the county clerk and the state officers.   This statement was made repeatedly during the sale as an inducement to purchase said lots and to advance the prices.   The same statement was also published in the Lincoln papers, over the signature of the the county clerk, prior to the sale.   I had paid these taxes under protest all these years with the investment in these lots in controversy of nearly one hundred dollars per acre on an average, counting the first payment of one-tenth of the purchase money with ten per cent interest in advance, and ten per cent interest in advance on the deferred payment for six years, counting the inter-

est at ten per cent per annum on these separate payments, together with the annual taxes, together with the interest on these several sums at ten per cent per annum, which constituted the amount of my vested interests and rights in these lots. I cannot conceive that I could have been informed that there was an effort being made to cut off my right and interest in these lots and set me out in the cold after six years and one-half of constructive possession, without due process of law, and I made no protest against it, especially when the state held my obligations with approved endorsers for the residue of the purchase money as required by the state officers at the time of the purchase. I feel certain as. I know myself, that I should have enjoined that sale if I had been informed concerning it; another reason that confirmed me that I knew nothing of the sale prior to said day, by the utter surprise which I experienced and well remember, when informed by J. V. Hoagland—I think it was him, on O street, in Lincoln, in front of the First National Bank, that all my lots above referred to in section 36 were sold; this was the first intimation I had of the sale or intended sale of these lots. This was in the afternoon of June 16th, 1876, on my way home from the B. & M. train. I hastened at once up to the county treasurer's office, and learned from C. C. White, county treasurer, that the sale was closed and all my lots in section 16 were sold."

Int. 4. "If you had any such knowledge or information as is mentioned in the last preceding interrogatory, state what it was and how it was obtained."

Ans. to Int. 4. "I had no such knowledge or information."

Int. 5. "Did you purchase from any person or persons any contract or contracts of sale executed by the treasurer of said county, or by any purchaser or purchasers, pursuant to any sale or sales of land that were made on the said 16th day of June, 1876?"

Ans. to Int. 5.   " On the afternoon of June 16th, 1876, after being officially informed by the county treasurer that all my lots were sold, I asked and received from him a list of the names of the purchasers of my lots, with the number of the lots that each had purchased.   As I remember them now, the purchasers were C. C. Burr, R. R. Tingley, J. H. McMurtry, N. S. Harwood, and one Miles, first name forgotten.   I was acquainted with all the purchasers except the last one named.   I immediately went to C. C. Burr and made a statement of the facts in connection with my former purchase, of the payments made thereon on my contracts, of interest and taxes from June 15th, 1868, and told him that I considered I had vested rights in the lots, and that I considered my claim equitable to the lots, and he took the same view and offered to release his claim to me. I done the same thing with Dr. Tingley with the same results.   I think Mr. Burr purchased three of the lots and Dr. Tingley one.   The others refused to relinquish their claims.   I had a long corespondence with Miles, lasting for months, in which I presented my claims to the lots, with all the facts connected with my purchase and payment, but he refused to do anything about it.   I paid neither C. C. Burr nor R. R. Tingley for their supposed rights under their bids for the lots, and they asked me nothing.   My recollection is that neither of them had paid any money on the lots, and do not think they made any assignment of contracts.   I think they had no contracts made out.   I do not think they made any written assignment of their bids or purchase to me, but think they went in and made a verbal release to the county treasurer.   I think that was all that was done about it at the time.   I think I paid no money to either of them ; do not think I paid any money on the lots to the county treasurer at the time, nor till some time after ; I think not till after my return from a trip to Chicago a month or so later.   But when I did go into the treasurer's office to fix up the mat-

ter I was presented by the county treasurer with a written release of these lots to the state from my former purchase of the same lots on June 15, 1868, giving as the reason that most of the counties had not re-sold their delinquent school lands, and that there were conflicting opinions and doubts as to the legality of the sales, which release I signed.

" I paid the one-tenth of the purchase money, with the interest, ten per cent in advance, and received my contracts for the lots. Whether this was a legal purchase from C. C. Burr and R. R. Tingley or from the state of Nebraska I cannot answer. I call it a kind of swap, in which the state got all I had previously paid on these lots, being more than double what they were now appraised at and sold for, besides paying the amount for the new contracts, said lots having been greatly depreciated in value by the state's illegal taxation on them. I have found myself unable to give a categorical answer to Interrogatory 5, but have tried to give an exact account of the whole transaction as it occurred, to the best of my knowledge and belief."

Int. sixth. " If you purchased any such contracts as are mentioned in the last named interrogatory, state from whom you got the same, what tract or tracts of land were named in the contract or contracts so purchased; whether the same were assigned to you, and what, if anything, you afterwards did with reference to compliance with the terms of said contracts, and whether you disposed of the same or any of them, and if so, what disposition you made of them ? "

Answer to Int. sixth. " I did obtain several such contracts in the way and under the circumstances as related in my answer to the last preceding interrogatory, but whether I obtained them legally from C. C. Burr and R. R. Tingley or from the state of Nebraska, or whether the release required by the county treasurer of my former purchase of these lots made a new transaction, I am unable to decide, but I got contracts for the lots that were struck off at that

time to C. C. Burr and R. R. Tingley, but which lots were sold to Burr and which to Tingley I do not now recollect. I think the two lots named in the first paragraph of the second stipulation were some of them. I cannot now give the number of the lots I got contracts for; I think there were four of them; do not think there was any written assignment of either of them to me from Burr or Tingley after the release of the old contracts. I complied with all the conditions of the new contracts while I held them, I think. I sold them all; do not now recollect to whom.

J. G. MILLER."

Theo. F. Hardenberg, being examined as a witness, testified as follows:

Question (4). What was your occupation March, '76? Clerk in the county treasurer's office.

(5). Do you recollect the sales of land in 36–10–6, in June of that year? I do.

(6). State whether you had anything to do with making out notices of delinquency of the payment of interest on the lands in that section? I did; I made up the notices preparatory to the sale of school lands.

(7). What steps did you take to notify delinquents of their delinquency in payment of interest, if any? Answer. I made up a list of all delinquent school lands that were delinquent for over two years for the county of Lancaster. I prepared notices showing the amount of delinquency. To all persons whose address I knew, the notices were mailed to them through the post-office.

(8). Do you recollect whether or not you sent a notice to the relator, Jason G. Miller? Ans. I know that his notice was prepared, and I have every reason to believe it was mailed to him with the others.

(9). If I understand you correctly, then is this what you mean to say, that all the persons whose addresses were known you sent written notices to? Ans. Yes, sir, written notices through the post-office.

(10). And such as were not known, what was done? They were advertised through the papers.

(11). Have you a copy of the notice such as mailed? I have not; I think all those things were destroyed when the county treasurer's office was removed from the old building to the new.

(12). Have you made a search for them? I have. I think those papers were in a bundle by themselves and were all destroyed.

(13). Can you state from memory what that notice contained, in substance? I can tell the substance of it. It contained the amount of each year's delinquency, with the interest added to it, showing the total amount of delinquency up to that time, and, as near as I remember, a statement that if this delinquency was not paid at once the lands would be forfeited.

#### CROSS-EXAMINATION.

Question (1). Who was treasurer at this time? Mr. Chas. White.

(2). When did you say these notices were sent out? In the spring of '76.

(3). What time in the spring? I don't remember.

(4). Who prepared them? I prepared them all.

(5). Who signed them? I think I signed them.

(6). As deputy treasurer? No, sir, I was not deputy.

(7). How does it come, then, that they were signed by you? I think I just signed his name, White.

(8). Did you ever show them to Mr. White? Yes, sir.

(9). You say you sent out the notices to all persons who were delinquent two years or over? Yes, sir.

(10). Then if it should turn out that Miller was not delinquent two years, was a notice sent to him? Probably not.

(11). When did you see one of these notices you prepared last? I don't remember.

(12). Have you seen one in five or six years? I can't say.

(13). You swear that you sent a notice to Jason G. Miller? Yes, sir.

(14). You swear positively that you sent him a notice, do you? Yes, sir.

(15). You are just as positive about that as that he was delinquent two years, are you? Just as positive.

(16). Have you ever seen that notice since? No, sir.

(17). Were any of them ever returned? I think not.

(18). What time were these notices sent out? In the spring of '76.

(19). Don't you know what time in the spring it was? No, sir; it was in the spring of the year.

(20). What makes you think it was in the spring of the year? Because it was some time before Mr. White went away. I think he went away some time along in June.

(21). How long do you think it was? I don't know—two or three months.

(22). And he went away in June? Yes, sir.

(23). What lots did you notify Mr. Miller that he was delinquent on? I can't state now.

(24). Do you know how many or what lots? No, sir.

(25). Now if it should turn out in evidence that J. G. Miller was not delinquent, you didn't send the notices, did you? It would seem so.

(27). When did you have your attention called to the fact of your having sent out these notices? I don't remember now. I have always known that there has been more or less controversy about it ever since they were sent out.

(28). What was the usual mode of sending them? By mail.

(29). Did you put the notice in the post-office to J. G. Miller? I have every reason to believe that I did if his lands were delinquent at the time I made out the list.

(30). You didn't skip any one? I know I couldn't skip anybody; I know I didn't skip Miller.

(31). How do you know? Because it wasn't possible to skip anybody, and I have a distinct recollection of this one.

(32). Do you remember any others? I mailed one to F. B. Cheney. I don't remember any others.

(33). How is it that you remember only these two? I was acquainted with the parties.

(34). Weren't you acquainted with any others? I don't remember.

(35). You think these notices stated that if they didn't pay up immediately these tracts would be forfeited? Exactly.

RE-DIRECT.

Question (1). Do you remember who prepared the form for these notices? I think Mr. White, the county treasurer, prepared them.

(2). You signed these notices under the direction of Mr. White? Yes, sir.

(3). Were these notices sent out before or after the publication to the non-residents? I suppose about the same time; I have no distinct recollection. I suppose it was about the same time.

C. C. White being called as a witness, testified as follows:

Question (2). What official position, if any, did you hold in Lancaster county in 1876? That of county treasurer.

(3). Do you remember the forfeiture sale of school lands in section 35, 10, 6, adjoining the city of Lincoln? Yes sir. I remember taking steps looking to the forfeiture and sale of lands in which lessees and purchasers were delinquent in payments to the state.

(4). State what steps you took. I may not be able to state all the steps that were taken, but my mind is refreshed

in regard to certain of them, such as serving notices upon parties whom the books showed to be delinquent, and furnishing a list of said delinquents to the district attorney, and proceeding according to his directions in the case. Just what those directions were specifically I am not able now to recollect.

(5). Do you recollect what kind of notice was used, whether printed or written? I am unable to recollect the exact form of the notices; they were probably printed, as there were a good many of them. In substance they were notified formally of their delinquency, and that unless within a short time these delinquencies were paid up, the premises would be forfeited to the state.

(6). In what manner were these notices served? I am unable to recollect. I may be able to refresh my memory by this letter.

(7). You think you can remember distinctly if you refresh your memory by the letter, do you? Yes, sir. This letter was written to the district attorney, in which I state that notices were served on non-residents by publication and upon residents by personal notice. I rely largely upon this letter, and it only refreshes and corroborates the indistinct recollection I had. When I knew the residence of the delinquent I served the notice personally.

(8). Can you state at about what time these notices were served? I don't know that I am able to recollect the date. I might say that this letter was dated March 27th, 1876. The notices were served prior to that time.

(9). Were you at that time acquainted with the relator, Jason G. Miller? Yes, sir. I was very well acquainted with him.

(10). Did you know at that time that he was delinquent on some of his contracts? I must have known it.

(11). Did you know where he resided at that time? I undoubtedly did.

(12). Will you consent that the letter to which you

refer may be attached as an exhibit to your deposition? Yes, sir.

(13). This letter was written in your official capacity as treasurer of Lancaster county to the district attorney in his official capacity, was it not? Yes, sir; as a report of what I had done, and asking for advice.

"The exhibit hereto annexed is a true copy of the letter to the district attorney above referred to.

CHAS. C. WHITE."

EXHIBIT "A."

"LINCOLN, NEB., March 27, 1876.

"*Hon. J. H. Broady, Dist. Atty., Judl. Dist., Brownville, Neb.:*

"DEAR SIR—Enclosed find list of the school lands of this county, the lessees and purchasers of which are delinquent in their payments of interest and lease money to the state. I have endeavored to comply with the law (chap. 70, sec. 18) in notifying them of such delinquency, and herein find copies of the notices served by me. The *published* notice is for those whose places of residence are to me unknown, the other, a copy of the one served personally or by mail upon resident owners.

"Will you, as attorney for county treasurers in such matters in your district, please advise me whether my action in the case is strictly legal, and what other steps, if any, are necessary for me to take. Also please return the enclosed list, if not needed by you.

Yours respectfully,

C. C. WHITE."

"TREASURER'S OFFICE, LANCASTER COUNTY, NEB., March 23, 1876.

"Whereas, the following named persons, whose places of residence are to the subscribers unknown, have severally violated the covenants of their respective bonds and

contracts with the state of Nebraska, relating to the pur-
chase by them of the tracts or parcels of school land here-
inafter described, and which appear opposite their respective
names.   Said violation consisting in the failure of said
parties to pay interest money to the state of Nebraska,
when by the terms of said bonds and contracts became due.
Now, therefore, in pursuance of the statute in such case
made and provided, notice is hereby given that unless said
delinquency is removed within thirty days from the date
hereof, by the fulfillment of the covenants of said bonds
and contracts, then said lands shall revert to, and the title
thereof be revested in the state of Nebraska."

Then follows names of purchasers with the tracts pur-
chased and the amount due from each thereon.

There is a large amount of other testimony to which it
is unnecessary to refer. It will be observed that in March,
1876, the relator was in default in paying interest on the
amount due the state on the lands in question for two years,
viz., 1875 and 1876.   Hardenburg swears positively that
he notified all persons who were in default two years in
the payment of interest, and in this he is corroborated by
the treasurer, White.   A clear preponderance of the testi-
mony, therefore, tends to establish the fact that the relator
had notice.   The law requires good faith on the part of pur-
chasers of school lands and a reasonable compliance with the
terms of the contract.   The interest is to be applied annu-
ally to the support of the common schools.   If one pur-
chaser may neglect for years the payment of interest owing
by him, and still maintain his contract, all other purchasers
may do likewise, and thus the purpose of the grant be en-
tirely defeated; and where a forfeiture has been declared of
which the party had notice, and no steps were taken at
once to set it aside, a presumption, after a great lapse of
time is, that the necessary notice was given.   In other
words, the law will presume official acts of public officers
to have been rightly done unless the circumstances of the

case overturn this presumption; and acts done which pre-suppose the existence of other acts to make them legally operative, are presumptive proof of the latter. *Bank of the United States v. Dandridge,* 12 Wheat., 70. *Coombs v. Lane,* 4 Ohio State, 112. *Ward v. Barrows,* 2 Id., 241.

The notice therefore was sufficient, and the relator's rights are barred.

(2). But suppose the relator was not served with notice, still he is not entitled to the writ. The testimony is un-disputed that he was informed in the afternoon of the day on which the sale took place that the lands in controversy had been sold by the state under an alleged forfeiture, and that the purchasers had paid one-tenth of the purchase price. These purchasers and their assignees have held undis-puted possession of said real estate from the time of purchase until this date, and have paid the interest on such pur-chases, and some of them have paid in full and have made valuable improvements on the land, and during all this time the relator has taken no steps to assert his alleged rights to said premises. In effect he has stood by, and by his silence said to said purchasers and their as-signees that he had no claim upon the property. This question was before this court in *Gillespie v. Sawyer,* 15 Neb., 536, in which the law of estoppel was applied. REESE, J., in quoting from *Kirk v. Hamilton,* 102 U. S., 68, said, " There is no principle better established in this court, nor one founded on more solid considerations of equity and public utility, than that which declares that if one man knowingly, though he does it passively by looking on, suffers another to purchase and expend money on land under an erroneous opinion of title, without making known his own claim, shall not afterwards be permitted to exercise his legal right against such person. It would be an act of fraud and injustice, and his conscience is bound by this equitable estoppel." It may be contended that his action is not against the purchasers of the land, hence that the

rule above stated would not apply. All the facts, however, upon which the relator bases his claims to the lands, and also in regard to the alleged forfeiture of said lands, the sale to other parties, the payment by them of interest from the time of purchase until this date, and the erection of valuable improvements thereon, are before the court, from which it appears that said purchasers and their assignees have been in possession for more than ten years, claiming the land as their own, and it is apparent that the relator is estopped to assert any title in said lands.

(3). The supreme court of Minnesota, in *McKinney v. Bode*, 23 N. W. Rep., 852, where one M., at a sale of school lands in 1872, purchased a tract of such land, paid part of the purchase price and the interest on the remainder to the succeeding June, received the usual certificate, went into possession, built a house, paid the interest due June, 1873, and remained in possession till December, 1873, when he executed an assignment of the certificate to his wife, and abandoned the land and his wife and family, and never afterwards resumed possession, nor gave any further attention to the matter. The wife and family remained in possession, and from December, 1873, a son who remained with his mother paid the taxes and the interest on the unpaid purchase money, for and on account of his mother, until her death in 1880, and after her death, for and on account of her estate, until November, 1880, when the administrator of her estate, under license from the probate court, sold and assigned the certificate to A. The latter thereupon paid to the land commissioners all arrears of principal and interest on the certificate, and a patent for the land was issued to him; it was held that, although the assignment of the certificate to the wife was void, M. had at the time of issuing the patent no equity to the land as against A.

That a party may abandon his contract with the state there is no doubt; but as the question of abandonment is not discussed in the brief of either counsel, we will not con-

sider it here.    It is clear that the relator has no interest in the lands in controversy, and the writ must be denied and the action dismissed.

JUDGMENT ACCORDINGLY.

THE other judges concur.